*Formatted for Electronic Distribution*                    *Not for Publication*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

Filed & Entered
On Docket
01/12/2024

_____

**In re:**

      **Blissful Dairy, LLC,**                    **Case # 19-10360**
          **Debtor.**                                   **Chapter 12**

_____

*Appearances:*

| | |
|---|---|
| *Rebecca A. Rice, Esq.* | *Bernard D. Lambek, Esq.* |
| *Cohen & Rice* | *Main Street Law, LLP* |
| *Rutland, Vermont* | *Montpelier, Vermont* |
| *For the Debtor* | *For Vermont Agricultural Credit Corporation* |
| | |
| *Paul A. Levine, Esq.* | *Antonin Robbason, Esq.* |
| *Lemery Greisler, LLC* | *Ryan, Smith & Carbine, Ltd.* |
| *Albany, New York* | *Rutland, Vermont* |
| *For Lydia and Andre Vorsteveld* | *For Faubert Feeds 2015* |
| | |
| *Jan M. Sensenich, Esq.* | *Lisa M. Penpraze, Esq.* |
| *Norwich, Vermont* | *Albany, New York* |
| *Chapter 12 Trustee* | *For the United States Trustee* |
| | |
| *Tavian M. Mayer, Esq.* | |
| *Mayer & Mayer* | |
| *South Royalton, Vermont* | |
| *For LiftTech* | |

## <u>MEMORANDUM OF DECISION</u>

      The Court considers the following remaining issues stemming from the July 25, 2023 Order

to Show Cause: (1) the determination of the amount of sanctions to be imposed; (2) whether

Vermont Agricultural Credit Corporation ("VACC") willfully violated the automatic stay; and (3)

if so, whether Debtor's principals are entitled to damages.[1] Debtor's counsel, the Chapter 12

Trustee, VACC and its counsel have submitted a revised sanctions proposal (as described in more

detail herein). Debtor's principals and VACC have reached a settlement on damages and have

requested the Court abstain from determining issue (3) set forth above. Part of the settlement

between Debtor's principals and VACC includes a potential deficiency as to Debtor's co-obligors

and the Court takes no position on that portion of the settlement although considers the deficiency

component of the revised sanctions proposal as withdrawn. For the reasons articulated below, the

Court imposes compensatory sanctions and approves, in part, the revised sanctions proposal before

the Court and grants the request to abstain to allow the settlement between VACC and Debtor's

principals to govern the award of damages.

## JURISDICTION

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157, 1334,

and the Amended Order of Reference entered by the U.S. District Court on June 22, 2012. The

Court determines that pursuant to 28 U.S.C. § 157(b)(2)(A) and (L), this proceeding contains core

matters, as it primarily involves proceedings concerning the administration of Debtor's estate and

plan confirmation, over which this Court has constitutional authority to enter a final judgment.

Each of the parties agree.

## PROCEDURAL BACKGROUND

Debtor commenced this case on August 29, 2019.[2] Shortly thereafter, the Court entered an

Order Concerning Chapter 12 Family Farmer Operating a Business (the "Operating Order") which

orders, inter alia, "unless the Chapter 12 debtor has Court approval or authority under an applicable

section of the Bankruptcy Code, it shall not (a) use, sell or lease property of the Estate other than

---

[1] All statutory citations refer to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.
[2] Doc. # 1.

2

in the ordinary course of business, (b) use, sell or lease cash collateral, or (c) obtain secured credit."[3]

By order dated September 29, 2019, the Court approved the appointment of Debtor's counsel, Cohen & Rice (Rebecca Rice, Esq.)[4] Jan M. Sensenich, the standing chapter 12 trustee, (the "Trustee") has served in such capacity for the duration of the case. VACC is a secured creditor in the case, represented by Bernard D. Lambek, Esq., of Main Street Law, LLP.

Debtor filed a chapter 12 plan of reorganization on November 27, 2019.[5] Several creditors and the Trustee filed objections to confirmation. Thereafter, Debtor filed an amended plan and the Court confirmed the amended plan by order dated August 17, 2020 (Confirmation Order).[6] Debtor and its creditors are bound by the terms of the Confirmation Order under § 1227 unless relief is sought from the Court pursuant to § 1229. The Confirmation Order prohibits Debtor from selling assets without notice and hearing:

> The debtor shall not buy, sell, use, lease (other than a lease of real property in which the debtor will reside) encumber or otherwise dispose of any interest in
> (a)     real property, or
> (b)     personal property with a value exceeding $10,000,
> outside the ordinary course of business, without notice to all creditors and the Chapter 12 Trustee, with an opportunity for hearing (unless such property is acquired through the use of credit and the Chapter 12 Trustee's consent is obtained pursuant to the first sentence of this paragraph).[7]

On June 9, 2023, Debtor filed a Motion to Modify Chapter 12 Plan (the "Motion to Modify")[8], disclosing for the first time that Debtor liquidated its milking herd and farm equipment in multiple sales without Court approval and without notice to creditors. No orders on the docket

---

[3] Doc. # 4 at ¶6.
[4] Doc. #7.
[5] Doc. # 12.
[6] Doc. # 53.
[7] Doc. # 53, ¶ 6.
[8] Doc. # 96.

3

authorized the post-confirmation sale of assets or granted relief from the automatic stay. During the hearing on the Motion to Modify on July 21, 2023, the Court learned that Debtor's counsel, the Trustee, VACC, Debtor's primary secured creditor, and VACC's counsel knew about the sales prior to their completion and did not seek Court intervention. During the hearing, the Trustee and Debtor's counsel originally claimed that the sales were emergent in nature, but later abandoned that position.[9] The sales eliminated the prospect of ongoing operations which formed the cornerstone of Debtor's Confirmed Plan to the detriment of Debtor's unsecured creditors. The Motion to Modify proposed to eliminate the original $82,563.00 distribution to unsecured creditors.[10]

On July 25, 2023, this Court issued an Order to Show Cause.[11] Over the course of a series of hearings, the Court provided the various parties an opportunity to be heard and present evidence on whether: (1) Court approval of the sales or relief from stay was necessary; (2) Court approval was necessary to retain an auctioneer to conduct the sales; (3) it is appropriate to fashion a remedy for the lack of notice to all creditors since the sales effectively eliminated Debtor's ongoing operations upon which the Confirmed Plan and creditors relied; and (4) contempt findings should enter and sanctions imposed.[12]

The Court held a hearing on September 22, 2023,[13] at which the Court considered various

---

[9] Debtor's counsel originally represented to the Court that the sales were on "super super super short notice" (July 21 Hearing Transcript at 7:17 (doc. #104)) and that there was insufficient time to obtain Court approval (July 21 Hearing Transcript at 8:23 (doc. #104)). In fact, no notice of the sales, which took place over a period of five months, *whatsoever* was provided to the creditor body. When tasked with presenting evidence of the responsiveness of the Court or how the Court's emergency process was not available to the Parties or insufficient under the facts and circumstances of this case (doc. # 134), each party conceded that no emergency existed.

[10] Doc. # 96.

[11] Doc. # 98.

[12] *Id.*

[13] The hearing was initially set for August 11, 2023, and was rescheduled based upon multiple pleadings and the United States Trustee's pending investigation (see docs. ## 98, 103, 109, 110, 116).

position statements filed with the Court during the week leading up to the hearing.[14] The position statements included a proposed allocation of sanctions among Debtor's counsel, the Trustee, VACC and its counsel[15] and a position statement filed by Debtor's principals, who retained individual counsel.[16] The United States Trustee filed a statement in support of the imposition of sanctions, while reserving rights as to the proposed allocation.[17] During the September 22 hearing, it became apparent that relevant documentation had not been produced in anticipation of the hearing and that the various parties were not adequately equipped to address the Order to Show Cause and namely, to present evidence.[18] Specifically, no one present was able to articulate who retained the auctioneer for the sale of the herd. When VACC's counsel referenced email correspondence, the United States Trustee objected as its office had not been provided a copy of that email correspondence.

Following the hearing and based on the status of the record, the Court issued a Scheduling Order[19] directing the Parties (as defined in the Order to Show Cause) and parties in interest to conduct discovery, prepare evidence, and brief questions which arose in the position statements filed before the hearing and during arguments at the hearing on September 22, 2023. In compliance with the Court's Scheduling Order, two Pretrial Statements were filed with the Court with

---

[14] Although the hearing was originally scheduled for August 11, 2023, each response to the Order to Show Cause was filed between September 15 and September 21, 2023 (docs. ## 119, 120, 121, 122, 123, 124, and 126).

[15] *See* doc. # 120. The Office of United States Trustee supported the sanctions proposal prior to the hearing on the basis that it would expeditiously make whole the unsecured creditors who were prejudiced by the extrajudicial asset sales (doc. # 119).

[16] *See* doc. # 124. The position statements raised additional issues not before the court prior to issuing its Order to Show Cause.

[17] *See* doc. # 119.

[18] While the Order to Show Cause specifically directed that the Parties (defined as counsel for Debtor, VACC and the Trustee) be prepared to present legal authority and evidence, if necessary, in support of their respective positions (doc. # 98), no evidence was presented. One of the points of inquiry was whether the Code or Federal Rules of Bankruptcy Procedure mandate prior approval of the auctioneer (*Id.)*. During the hearing, VACC's counsel referenced email correspondence which had not been provided to the Office of United States Trustee during its investigation.

[19] *See* doc. # 134.

supporting documentation.[20] In preparation for this hearing, the Parties submitted a Joint Pretrial Statement.[21] Andre and Lydia Vorsteveld, Debtor's principals, submitted a separate Pretrial Statement in their individual capacities.[22] The Joint Pretrial Statement filed by Debtor's counsel, the Trustee, and VACC contains a revised proposal for sanctions to address the Court's concerns.[23]

On October 27, 2023, the Court held a hearing pursuant to the Scheduling Order at which the following professionals appeared: Lisa M. Penpraze, Esq., Assistant United States Trustee on behalf of the United States Trustee; Jan M. Sensenich, Esq., in his capacity as Chapter 12 Trustee; Rebecca A. Rice, Esq., individually and as counsel for Debtor, Bernard D. Lambek, Esq., individually and as counsel for VACC; Peter Fitzgerald, Director of Loan Resolution with Vermont Economic Development Authority and authorized representative of VACC; Paul A. Levine, Esq., as counsel for Lydia and Andre Vorsteveld, Debtor's principals; Antonin Robasson, Esq., as counsel for Faubert Feeds 2015, and Tavian Mayer, Esq. as counsel for LiftTech.

Debtor, Debtor's counsel, VACC, VACC's counsel and the Trustee have stipulated that (1) Court approval was necessary for the sales with requisite notice and hearing; (2) Court approval was necessary for the retention of an auctioneer; (3) it is appropriate for the Court to fashion a remedy; and (4) sanctions should be imposed. At the hearing, the Court made the following preliminary findings: (1) Debtor, Debtor's counsel, VACC, VACC's counsel and the Trustee are in contempt of court; and (2) VACC violated the automatic stay. The Court considered evidence relating to the pending issues before the Court while taking the revised sanctions proposal under

---

[20] *See* docs. ## 139 and 140.

[21] *See* doc. # 139.

[22] *See* doc. # 141.

[23] In its Scheduling Order (doc. # 134), the Court required the Parties to address whether interested party, Faubert Feeds 2015, should recover its actual and reasonable attorney's fees incurred to date for its participation and contribution to the investigation stemming from the Order to Show Cause and, if so, in what amount. The amended proposal, discussed in this opinion, includes additional amounts to cover these fees (doc. # 139). Faubert Feeds has agreed to the increase in the Parties' proposal (doc. # 139 at p. 14).

advisement. The Court sets forth its findings in greater detail herein.

## FACTUAL BACKGROUND

The relevant underlying facts are not in dispute. Debtor experienced financial struggles in 2021 and 2022 which were exacerbated by the decrease in the price of milk and production coupled with an increase in expenses.[24] In addition to the financial struggles, Debtor's principals suffered tragic life events which impacted their ability to continue farming.[25] Accordingly, Debtor began exploring exit strategies with its counsel as early as December 2021.[26] Additional email correspondence about a potential sale of the farm, whether as an operating dairy farm or separate sales of the herd, equipment and real estate, occurred among Debtor, its financial professionals, Attorney Rice, the Trustee, VACC and a realtor, in various configurations, throughout 2022.[27] During a VACC field visit in April 2022, Mr. Vorsteveld expressed interest in selling the farm and Mr. Fitzgerald reminded him that Bankruptcy Court approval was necessary for the sale process.[28] On May 18, 2022, Attorney Rice advised Mr. Vorsteveld, "Generally, the court and the trustee approve a specific sale…"[29]

On November 23, 2022, Attorney Rice emailed Mr. Fitzgerald and Attorney Lambek regarding a potential sale of the herd.[30] On the same date, Attorney Rice had a phone conversation with Jon Lussier, an auctioneer, and discussed the sale terms for an auction.[31] Mr. Fitzgerald had a separate conversation that same date with Reg Lussier.[32] For clarity, brothers Jon and Reg Lussier

---

[24] *See* doc. # 139, ¶ 1(a); Exhibit A; doc. # 141, ¶¶ 21-29.

[25] *See* doc. # 121, ¶¶ 1-2; doc. # 139, Exhibit A.

[26] *See* Exhibits V-1 and V-2.

[27] See Exhibits V-3, V-4, V-6, V-7, V-8, V-9, V-10. No one disputes the various email messages were sent and/or received or that various zoom meetings were held.

[28] *See* Exhibit Q. *See also,* audio file of April 14, 2020, hearing (doc. #157) during which Attorney Rice assured the Court that Mr. Vorsteveld understood the necessity of Court approval of a sale.

[29] *See* Exhibit V-6.

[30] *See* Exhibit B. Debtor's counsel represented to the Court that Debtor had worked closely with Peter Fitzgerald at VACC prior to her knowledge about the potential sales (July 21 Hearing Transcript at 7:44 (doc. #104))

[31] *See* Exhibit D.

[32] *See id.*

are auctioneers who work together as "Lussier Auction" and will be referred to interchangeably as the "Auctioneer."[33]

The next day, the Auctioneer met with Mr. Vorsteveld at Debtor's farm to discuss the sale of the herd.[34] Later that day, the Auctioneer consulted with Attorney Rice and Mr. Fitzgerald about the proposal for the conduct of the sale and the payment terms for the Auctioneer.[35]

On Monday, November 28, 2022, Attorney Rice sent an email to the Auctioneer and copied the Trustee with an attached affidavit and a copy of this Court's local rules regarding a debtor's application to retain an auctioneer.[36] In her email, Attorney Rice confirmed she had discussed the arrangement with the Trustee and that it "was fine if you deducted your fee from the proceeds and sent the balance to him."[37] No signed affidavit was ever returned[38] and Debtor did not file a motion to retain the auctioneer.

In a phone call on Friday, December 2, 2022, the Auctioneer told Mr. Fitzgerald that he wanted "the cattle to start moving Monday morning," and that he wanted authorization to proceed.[39] Mr. Fitzgerald drafted, circulated to VACC's counsel, Debtor's counsel, and the Trustee, and ultimately forwarded via email to the Auctioneer[40] the following authorization:

> Dear Reg and Jon:
> You are hereby authorized to sell all of the cattle owned by Blissful
> Dairy to maximize the available proceeds to the bankruptcy estate,
> at your discretion, through any of the methods listed below:
> New Holland Sale Barn, New Holland, PA
> Organic Beef direct purchaser
> Cambridge, NY auction house

---

[33] Exhibit D; Exhibit K.
[34] *See* doc. # 139 at ¶1 (c); Exhibit D.
[35] *See Id.*
[36] *See* Exhibit E. *See also,* Exhibit C which reflects Jon Lussier and his brother Reg Lussier, met with Mr. Vorsteveld on November 24, 2022, and then directly contacted Attorney Rice and Mr. Fitzgerald.
[37] *See* Exhibit E.
[38] *See* doc. # 139 at ¶1(i).
[39] *See* doc. # 139, ¶ 1(j) and Exhibit I.
[40]*See* Exhibit I and Exhibit V-15.

Lussier Auction Service will receive a 3% commission. New Holland Sale Barn will receive a 5% commission.

Net proceeds will be paid to the Chapter 12 Bankruptcy Trustee as follows:
[listing the trustee's name and address].

Please keep us posted on the progress of the sale.

Thanks, Pete.[41]

Throughout the email correspondence, none of the participants questioned or raised the necessity of Court approval for retention of the Auctioneer for the sale of the herd or the sale itself. In apparent reliance on Mr. Fitzgerald's authorization, the Auctioneer shipped and sold the entire herd in installments during the month of December 2022.[42] On December 5, 2022, Reg Lussier emailed Mr. Fitzgerald with an update of the cattle being shipped.[43] On December 7, 2022, Reg Lussier emailed Mr. Fitzgerald with another update on the status of cattle being shipped.[44]  On December 9, 2022, Jon Lussier noted he "talked to Peter Fitzgerald on the way home and updated him on the deal."[45] On December 13, 2022, Mr. Fitzgerald texted Mr. Vorsteveld, stating that the Auctioneer kept Mr. Fitzgerald informed on the herd sales and he would like to schedule a meeting "to touch base with you [Mr. Vorsteveld] on the sale of the farm and equipment."[46] On December 14, 2022, Reg Lussier emailed Mr. Fitzgerald with a further update on the disposition of the remaining cattle.[47] Throughout the liquidation process, the Auctioneer reported to VACC through Mr. Fitzgerald.

In January 2023, Mr. Fitzgerald and Reg Lussier continued to correspond about the sale of

---

[41] *See* Exhibit I and Exhibit V-15.
[42] *See* docs. # 123 and 140. Between December 5, 2022, and December 21, 2022, 406 head were sold.
[43] *See* Exhibit V-17. No one else was copied on the email.
[44] *See* Exhibit V-18. No one else was copied on the email.
[45] *See* Exhibit C.
[46] *See* Exhibit V-40.
[47] *See* Exhibit V-20.

the herd and specifically, commission checks.[48] At one point, Mr. Fitzgerald asked Mr. Lussier if he had gotten his commission check: "If not, let me know. Then **we** can send a bill to [the Trustee]." [emphasis added].[49] In connection with the discussions about commission checks, the Trustee stated: "Getting this kind of money from a sale of a herd that is not specifically in a confirmed plan is a new area for me, and I want to make sure I have sufficient authority for any disbursements."[50]

On February 14, 2023, Mr. Fitzgerald sent an email to Reg Lussier: "It's feeling a bit like spring out today – so got me thinking about a spring equipment auction. Have you been in touch with Andre [Vorsteveld]?"[51] On February 15, 2023, Reg Lussier responded that he and Jon will follow up with Mr. Vorsteveld.[52] On February 24, 2023, Mr. Fitzgerald forwarded a signed auction contract between Debtor and the Auctioneer to Debtor's counsel, the Trustee, and VACC's counsel, noting that the auction is scheduled for April 19, 2023.[53] On March 7, 2023, Mr. Fitzgerald followed up with Debtor's counsel, the Trustee, and VACC's counsel stating: "The Lussiers are looking for the go-ahead on preparing for the auction. Is everyone OK with this contract provided all the funds go through [the Trustee]?"[54] No one sought Court approval of the retention of the Auctioneer for the sale of the equipment or the sale itself.

Debtor's farming equipment was sold at auction in April 2023.[55] In connection with the April 19, 2023 auction of the equipment, Mr. Fitzgerald requested an internal lien search which identified Diversified Financial Services as a secured creditor.[56] Mr. Fitzgerald attended the

---

[48] *See* Exhibits V-23, V-24, and V-25.
[49] *See* Exhibit V-23.
[50] *See* Exhibit V-25.
[51]*See* Exhibit V-26.
[52] *See* Exhibit V-27.
[53] *See* Exhibit V-28
[54]*See* Exhibit V-29.
[55]*See* doc. # 139, Exhibit M; doc. # 141 at ¶50.
[56] *See* doc. # 141, Exhibit V-30. Diversified Financial Services was listed as a secured creditor in the Confirmation

equipment auction.[57]

For ease of reference, the Court refers to the various sales of cattle and the equipment as the "Unauthorized Sales." It is undisputed that the Unauthorized Sales cannot be justified or excused based upon a claimed emergency.[58]

After the sales and during April 2023, a series of email communications took place between Debtor, Debtor's counsel, Mr. Fitzgerald, VACC's counsel, the Trustee and Curtis Trousdale, a real estate broker.[59] Mr. Trousdale addresses his email correspondence relating to a proposed offer on the real estate to "Peter and Group."[60] At that time, Debtor had not sought Court approval to retain Mr. Trousdale. An Application was filed on July 13, 2023, which was later withdrawn.[61]

In early May 2023, the Trustee expressed concern about disbursing the proceeds from the Unauthorized Sales without an order, motion, or amended plan addressing the Unauthorized Sales.[62] On May 31, 2023, Mr. Fitzgerald urged the Trustee to distribute the proceeds from the Unauthorized Sales to VACC net of the Trustee's fees so that he could report on the file as of VACC's fiscal year end.[63]

On June 1, 2023, Mr. Fitzgerald requested a monthly direct report from Mr. Trousdale on "sales activity, number of showings, etc." relating to a proposed sale of Debtor's real estate.[64] In that same correspondence, Mr. Fitzgerald warns Lydia Vorsteveld that VACC will need to look to

---

Order (doc. # 53) and the Court requested the Parties to address the status of payment to Diversified Financial Services. The Parties submit that Diversified Financial Services has been paid in full. However, there is no evidence before the Court as to when and how that claim had been paid.

[57] *See* Exhibit V-37.
[58] *See* Footnote 2.
[59] *See* Exhibit V-31.
[60] *See id.*
[61] *See* doc. # 97 and withdrawal entry dated September 14, 2023.
[62] *See* Exhibit V-32. The Trustee's email correspondence dated May 5, 2023, indicates that Attorney Rice promised that an Amended Plan would be forthcoming "next week." But recognizes that "the idea that all of this happened without anything on the record is concerning."
[63] *See* Exhibit V-33.
[64] *See* Exhibit V-33.

the personal assets of Andre and Lydia Vorsteveld as Debtor's co-obligors in the event of a shortfall. Mr. Fitzgerald specifically references a personally owned 50-acre parcel to "make up some of that shortfall."[65]

## DISCUSSION

The commencement of a bankruptcy case creates an estate comprised of all legal and equitable interests of the debtor in property. *See* § 541(a). "Property of the estate is central to the bankruptcy process" because it "becomes the 'pot' from which all claims against the debtor will be paid." *In re Aller,* 649 B.R. 662, 664-65 (Bankr. W.D. Pa. 2023) (quoting *United States v. Robinson (In re Robinson),* 764 F.3d 554, 559 (6th Cir. 2014)). While estate property, such as the current debtor's milking herd and equipment, can still be sold, sales during the bankruptcy are subject to court oversight. *See* § 363(b)(1); *In re Sillerman,* 605 B.R. 631, 648 (Bankr. S.D. N.Y. 2019) ("To ensure assets are preserved for the benefit of creditors, the Debtor cannot dispense assets outside the ordinary course without court approval").

The Bankruptcy Code and Federal Rules of Bankruptcy Procedure contain multiple provisions to ensure such oversight. *See generally,* §§ 549, 363, 1206 and Fed. R Bankr. P. 2002 and 6004; *see also* Vt. LBR 2002-1 and 6004-1.  Section 1227(b) provides that confirmation of a plan vests all of the property of the estate in the debtor.  Section 6(a) of Debtor's confirmed plan provides, "Property of the estate shall revest in the debtor upon the completion of Plan payments by the debtor."[66] Plan payments are not yet complete. Property of the estate had not revested in Debtor when the Unauthorized Sales occurred.  The Confirmation Order prohibits Debtor from selling assets without notice and hearing outside the ordinary course of business.[67]

---

[65] *Id.*
[66] Doc. # 46.
[67] Doc. # 53, ¶6.

**A.  Noncompliance with the Bankruptcy Code, Rules, and Court's Orders.**

**1.  Unauthorized Sales**

Debtor, its principals, Attorney Rice, in her capacity as counsel for Debtor and individually, VACC, Attorney Lambek, in his capacity as counsel for VACC and individually, the Trustee, and the United States Trustee each concede that the Unauthorized Sales were not conducted in compliance with this Court's orders, the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure. Property of the estate had not yet revested with Debtor. The Unauthorized Sales were conducted outside the ordinary course of Debtor's business as an organic dairy farm without Court order in violation of § 363(b)(1), and without notice and hearing in violation of Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure. Likewise, the Trustee, VACC, VACC's counsel, Debtor, Debtor's counsel, and the United States Trustee each acknowledge and agree that the Unauthorized Sales violated the Operating Order and the Confirmation Order entered by this Court which prohibited the sales without Court approval.

**2.  Unauthorized Retention and Payment of Professionals**

Section 327 of the Code permits a trustee or a Chapter 12 debtor in possession to employ professionals such as an auctioneer with the Court's approval if they do not hold or represent an interest adverse to the estate, are disinterested, and will assist the trustee or debtor in possession with carrying out the obligations under the Code. § 327(a); § 1203; Fed. R. Bankr. P. 6004; *see also,* Vt. LBR 2014-1; Vt. LBR 6005-1. Another Bankruptcy Code provision, § 330(a)(1), provides "a bankruptcy court may award…reasonable compensation for actual, necessary services rendered by those professionals." *See* § 330; *see also,* Vt. LBR 2016-1. "[T]he statute authorizes an award of compensation to one of three types of persons: trustees, examiners, and § 327 professional persons." *See* § 330; *see also,* Vt. LBR 2016-1. "[Section] 330(a)(1) does not

authorize compensation awards … from estate funds, unless [the professionals] are employed as authorized by § 327." *Lamie v. United States Trustee,* 540 U.S. 526, 538, 124 S. Ct. 1023 (2004).

Federal Rule of Bankruptcy Procedure 2016 provides, "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application..." Fed.R.Bankr.P. 2016(a). Such applications must be sufficiently detailed to allow the court to perform its required, and independent, assessment of reasonableness under § 330(a). *See In re Molina,* 632 B.R. 561, 571 (Bankr. S.D.N.Y. 2021); 9 Collier on Bankruptcy ¶ 2016.12 (16th). Despite Attorney Rice's providing Vt. LBR 6005-1 and an affidavit in support of retention to the Auctioneer via email, it is undisputed that no application to retain was ever filed under § 327 and that no application for compensation was filed in accordance with § 330 or Fed. R. Bankr. P. 2016. Contrary to those provisions and the local rule forwarded by Attorney Rice, with the blessing of the Trustee, Attorney Rice permitted the Auctioneer to pay themselves prior to turning over net sale proceeds to the Trustee.[68] While Attorney Rice may have attempted to distinguish the Auctioneer as potentially a "consultant" for the sale of the milking herd (*See* Exhibit H), she does not address the Auction Contract for the equipment which identifies Auctioneer as the auctioneer for the sale. The Court finds that even if acting in a consultant capacity regarding the sale of the milking herd, with the Auctioneer's specialized knowledge, the Auctioneer was a professional subject to §§ 327 and 330 and thus, the retention and compensation was subject to Court approval.

In addition, the compensation paid to the Auctioneer violated Vt. LBR 6005-1(e)(2) which sets forth the maximum allowable commissions on the gross proceeds of each sale. The commissions paid exceed the maximum amounts by $6,300.10.[69] The Trustee, VACC, VACC's counsel and Debtor's counsel recognize the overpayment. VACC claims that because such excess

---

[68] *See* doc. # 139, Exhibit H; doc. # 140.
[69] *See* doc. # 140.

amounts would have accrued to VACC's benefit, VACC waives any claim to such amounts.[70]

### 3. Violation of the Automatic Stay

The purpose of the automatic stay is to preserve the assets of the debtor for the benefit of all creditors and protect the creditors from each other by stopping the race to seize the debtor's assets. *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp., Ltd.,* 244 B.R. 209, 220 (S.D. N.Y. 2000); *Bayview Loan Servicing LLC v. Fogarty (In re Fogarty)*, 39 F.4th 62, 71 (2d Cir. 2022) (stay "protect[s] bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate."). The automatic stay is, by its very terms, automatic. *In re Colonial Realty Co.,* 980 F.2d 125, 137 (2d Cir. 1992). No court action is necessary for it to take effect; the filing of a bankruptcy petition operates as a stay. *See* § 362; *Shimer v. Fugazy (In re Fugazy Express, Inc.),* 982 F.2d 769, 776 (2d Cir. 1992) ("Section 362 of the Code operates, immediately upon a debtor's filing of a bankruptcy petition, to, inter alia, stay automatically any act to transfer control over property of the estate."). "The automatic stay is necessary to permit the debtor breathing space so that he may reorganize his affairs, free from the harassment of wage garnishments, foreclosure proceedings and repossessions. The scope of the automatic stay is necessarily broad so that debtors may reorganize their affairs in an orderly and equitable fashion." *See In re Briskey*, 258 B.R. 473, 477 (Bankr. M.D. Ala. 2001); *see also Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi)*, 764 F.3d 1168, 1173 (9th Cir. 2014) (*quoting Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n,* 997 F.2d 581, 585 (9th Cir. 1993)) (recognizing that the automatic stay "is designed to effect an immediate freeze of the *status quo* by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy fora against the debtor **or** affecting the property of the estate.")

---

[70] *See* doc. # 139 at p. 12.

(emphasis added).

Under § 362 the following actions are stayed: any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate (§ 362(a)(3)); any act to create, perfect, or enforce any lien against property of the estate (§ 362(a)(4)); any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the bankruptcy case (§ 362(a)(6)). By its very terms, § 362 focuses on property of the estate.

VACC, Debtor's primary secured creditor, concedes that the milking herd and farm equipment were property of the estate. Nonetheless, VACC contends it did not violate the automatic stay because its involvement in the liquidation of its collateral was not adverse to the Debtor since the sales were authorized by Debtor and its counsel.[71] VACC's argument is misplaced. The plain language of § 362 prohibits acts against *property of the estate* not against the debtor. VACC's mistake of law is insufficient to insulate it from liability. *See In re Campbell,* 398 B.R. 799, 811-12 (Bankr. D. Vt. 2008). It is well settled that since the purpose of the automatic stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay. *See Commerzanstalt v. Telewide Sys., Inc.,* 790 F.2d 206, 207 (2d. Cir. 1986); *also In re Fugazy,* 982 F.2d at 776 ("Unless lifted by the court, the stay remains in effect until the case is concluded."); *Constitution Bank v. Tubbs,* 68 F.3d 685, 691 (3d Cir. 1995) ("The automatic stay cannot be waived. Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case). Since the automatic stay cannot be waived by the Debtor, and given the import of the stay in protecting the Debtor's creditors as well as the Debtor itself, the Court rejects VACC's reasoning that because it perceived its actions were not adverse to the Debtor that it did

---

[71] *See* doc. # 139 at pp. 12-13.

not violate the automatic stay.

Section 362(a)(3) is deliberately broad – encompassing "any act" to exercise control over property of the estate. To "exercise control" means "to exercise restraining or directing influence over" or "to have power over." *Thompson v. GMAC, LLC,* 566 F.3d 699, 702 (7th Cir. 2009). The Supreme Court has recognized that § 362(a)(3) prohibits affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed. *See City of Chicago v. Fulton,* 592 U.S. 154, 158, 141 S.Ct. 585, 590 (2021). Section 362(a)(4) prohibits "any act to create, perfect, or enforce any lien against property of the estate." Section 362(a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." The stay continues during the life of a plan to prevent the collection of most pre-petition debts. *See* § 362(a)(6).

The record demonstrates VACC took multiple affirmative acts to control property of the estate, to enforce its lien against property of the estate and to collect on its claim that arose before Debtor sought bankruptcy relief. No one disputes the Unauthorized Sales materially altered the status quo. VACC, a secured creditor with a security interest in the herd, equipment, and real estate, urged the Unauthorized Sales, both with the Auctioneer and Debtor. VACC consulted the Auctioneer directly and negotiated the conduct of the Unauthorized Sales and the Auctioneer's payment terms. VACC initiated the retention of the Auctioneer for the sale of the herd by drafting and circulating a written authorization for the liquidation of its collateral. Debtor's principals were not copied on that correspondence and there was no written engagement signed by the Debtor with respect to the sale of the herd. The Auctioneer provided updates directly and often with VACC on the status of the various cattle sales.  After the sales were complete, VACC continued to correspond directly with the Auctioneer about the sale of the herd and specifically, payment of the

Auctioneer's commission. VACC controlled the sale of the herd.

While there is a signed Auction Contract between the Auctioneer and Debtor for the sale of equipment, VACC prompted the equipment sale. VACC prodded the Auctioneer and Debtor separately to move forward with the sale of its collateral at the equipment auction. The Auctioneer transmitted the Auction Contract via facsimile directly to VACC through Mr. Fitzgerald who then forwarded the Auction Contract to the Trustee and Debtor's counsel informing them of the equipment auction date. Mr. Fitzgerald sent a follow up email to the Trustee and Debtor's counsel coordinating their approval of the Auction Contract after he exchanged direct communication with the Auctioneer. Much like a secured party sale completed under Article 9 of the Uniform Commercial Code, VACC ran an internal search of security interests in the equipment prior to the equipment auction.[72] VACC attended the equipment auction.[73]  In May 2023, VACC requested the Trustee distribute the net proceeds from the Unauthorized Sales to VACC and continued to press Debtor on the status of the sale of the real estate.[74] The Court finds VACC violated the automatic stay.

VACC was represented by counsel since the inception of this case and had a remedy at its disposal. VACC could have petitioned the Court to lift the stay under § 362(d) to obtain Court approval to liquidate its collateral. Section 362(d) provides, in relevant part, that the Court shall grant relief from the stay in appropriate circumstances "[o]n request of a party in interest and after notice and a hearing." *In re Fugazy Express, Inc.,* 982 F.2d at 776 (2d Cir. 1992); *In re Computer Communications, Inc.,* 824 F.2d at 728. However, rather than pursuing relief from the stay, VACC opted to engage in "self-help" which resulted in multiple violations of the automatic stay, to wit:

---

[72] Unlike a secured party sale, VACC did not provide notice to other creditors. *See generally,* 9A V.S.A. § 9-611 (2001).
[73] *See* Exhibit V-37.
[74] *See* Exhibit V-33.

initiating, negotiating, and coordinating the liquidation of its collateral. "Nothing in the Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay." *Id.* Only the Court may lift the stay. *Id.*

The automatic stay is considered an equivalent to a court order such that a violation of the stay is punishable as a contempt of court when the violation is knowing and willful. *See In re Arcapita Bank B.S.C. (C),* 648 B.R. 489, 496 (S.D.N.Y. 2023) (citing *Knupfer v. Lindblade (In re Dyer).* 322 F.3d 1178, 1191 (9thCir. 2003) ("Because the metes and bounds of the automatic stay are provided by statute and systematically applied to all cases, there can be no doubts that the automatic stay qualifies as a specific and definite court order.")).

## B. Contempt and Sanctions

In the Second Circuit, authority for the imposition of sanctions stems from two sources: (1) Section 105(a) of the Bankruptcy Code which provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and (2) the Court's inherent contempt powers. *See* § 105(a) *Taggart v. Lorenzen ex rel. Brown,* 587 U.S. ___, 139 S.Ct. 1795, 1800 (2019); *PHH Mortg. Corp. v. Sensenich ex rel. Gravel (In re Gravel)*, 6 F.4th503, 512 (2d Cir. 2021); *Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.),* 920 F.2d 183, 187 (2d Cir. 1990); *see also Solow v. Kalikow (In re Kalikow),* 602 F.3d 82, 96-97 (2d Cir. 2010) ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders. …These powers are in addition to whatever inherent contempt powers the court may have." (citation and quotation marks omitted)); *see also* Fed. R. Bankr. P. 9020.; *Worms v. Rozhkov (In re Markus)*, 78 F.4th 554, 564 (2d Cir. 2023) (*quoting Shillitani v. U.S.*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *In re Chateaugay Corp.,* 920 F.2d. at 184-187.

The Supreme Court has held that a bankruptcy court may hold a party in civil contempt if there is "no fair ground of doubt" that the conduct violated a court order. *See Taggart,* 139 S.Ct. at 1799. The "fair ground of doubt" standard has long been recognized by the Second Circuit. *See In re Gravel,* 6 F.4th at 512 (*citing King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995)). As emphasized in *Taggart,* "civil contempt is a severe remedy" and "basic fairness requires that those enjoined receive explicit notice of what conduct is outlawed." 139 S.Ct. at 1802. In particular, a contempt order is warranted only where the party has notice of the order, the order is clear and unambiguous, and the proof of noncompliance is clear and convincing. *King,* 65 F.3d at 1058.

### 1. Civil Contempt Findings

Debtor, Debtor's counsel, VACC, VACC's counsel and the Trustee agree they violated the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and this Court's orders, leaving no fair ground of doubt that their conduct violated multiple Court orders.  In this case, Debtor, Debtor's counsel, VACC, VACC's counsel and the Trustee had notice of the Court's Operating Order and the Confirmation Order which each unambiguously prohibited the sale of personal property exceeding $10,000 in value outside the ordinary course of business, without notice to all creditors and without an opportunity for hearing in accordance with § 362. Neither Debtor, Debtor's counsel, VACC, VACC's counsel nor the Trustee disputes they were bound by the Confirmation Order under § 1227 or that the Unauthorized Sales violated the Court's orders, the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure. All received notice of the orders and no one presented any evidence as to why they could not comply with the orders.  Under its inherent power and § 105(a), the Court finds Debtor, Debtor's counsel, VACC, VACC's counsel and the Trustee to be in civil contempt.

Likewise, Debtor's counsel, VACC, VACC's counsel, and the Trustee acknowledge that the retention and payment of the Auctioneer violated §§ 327 and 330, Fed. R. Bankr. P. 2016 and 6004, in addition to this Court's local rules. Counsel knew that Court approval was necessary, as reflected in their correspondence and specifically Attorney Rice's email to the Auctioneer with a proposed affidavit in support of retention. Each of the practitioners is an established insolvency professional with notice of the unambiguous requirements to retain and compensate professionals and the proof of noncompliance is clear and convincing.

Without citing to any authority, even while proposing sanctions, the Trustee and VACC's counsel argue that contempt findings are not warranted because there was no bad faith or specific intent to disobey a court order (doc. #122). On the record, their disregard of the necessity of Court approval for the Unauthorized Sales and the retention of the Auctioneer has been characterized as a "lapse in judgment,"[75] or "unintentional."[76] However, these characterizations do not support a finding of good faith sufficient to mitigate the imposition of sanctions. Their disregard was pervasive given the five-month time span of the Unauthorized Sales that took place seven months before inadvertently bringing the sales to the attention of the Court in the Motion to Modify. They have cited to no reasonably diligent and energetic attempt to accomplish what was ordered or to comply with the Bankruptcy Code. *See In re Gravel,* 6 F.4th at 516; *King,* 65 F.3d at 1058; *In re Residential Cap., LLC,* 571 B.R. 581, 585 (Bankr. S.D. N.Y. 2017).

Furthermore, under this Court's inherent power, the Court "***need not always*** find bad faith before sanctioning pursuant to its inherent powers," *In re* Markus, 78 F.4th at 566 (emphasis added). When the inherent power is invoked to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's

---

[75] Testimony of Peter Fitzgerald, October 27, 2023 (doc. # 149 at 1:07:00-1:07:34).
[76] *Id. See also,* Closing Remarks of Attorney Lambek, October 30, 2023 (doc. # 152).

benefit, the court need not find bad faith before imposing sanctions. *See United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000). No finding of bad faith is necessary when an attorney's misconduct falls within their role as an officer of the court. *In re Markus*, 78 F.4th at 566. The Court need not find bad faith in this case as the misconduct of Debtor's counsel, VACC's counsel and the Trustee falls within their role as officers of the Court.

### 2. Sanctions Finding as to Debtor

While the Court finds Debtor in contempt, the Court finds sanctions against Debtor are not warranted under the circumstances of this case. Although the record establishes that Debtor knew Court approval was necessary, during the Unauthorized Sales process, Debtor acted with the full knowledge and upon the advice of its bankruptcy counsel. Based upon the involvement of Debtor's counsel, the Trustee, VACC and VACC's counsel, it was reasonable for Debtor and its principals to have believed that the Unauthorized Sales were being conducted in an appropriate and legally sound manner. Thus, sanctions are not warranted against Debtor.

### 3. Sanctions Proposal

Debtor's counsel, VACC, VACC's counsel and the Trustee have submitted a revised sanctions proposal to the Court (doc. # 139). The relevant provisions of the proposal are as follows: (1) VACC will release its claimed lien on the coop equity accounts; (2) the equity accounts shall be considered property of the Debtor-in-possession; and (3) VACC and its counsel shall make available a $105,000 dividend to unsecured creditors (with VACC excluded from that group for the purpose of distribution) through a modified plan.[77] There are additional provisions that detail contribution amounts among VACC, VACC's counsel, the Trustee and Debtor's counsel, not

---

[77] Doc. # 139 at p. 9. As set forth above, the Court considers those provisions relating to an anticipated deficiency claim as withdrawn pursuant to the Settlement between VACC and Debtor's principals (doc. # 167).

based upon respective culpability of the parties.[78] The parties submit the revised sanctions proposal reinstates the dividend to unsecured creditors under the Confirmed Plan and includes costs and expenses caused to the unsecured creditors stemming from the Order to Show Cause.[79]

### 4.   Approval, in part, of the Sanctions Proposal.

Courts can award three types of sanctions under their civil contempt powers: (1) coercive sanctions to encourage compliance; (2) damages for monetary harm; and (3) punitive sanctions in appropriate circumstances. *Windstream Holdings, Inc. v. Charter Communs. Inc. (in re Windstream Holdings, Inc.)*, *vacated in part* 627 B.R. 32, 47-48 (Bankr. S.D.N.Y. 2021). The Court and parties have spent considerable time on the Order to Show Cause. The Trustee, Debtor's counsel and VACC's counsel recognize that they did not comply with the Code, the Federal Rules of Bankruptcy Procedure, this Court's local rules or orders.

Based upon the facts and circumstances of this case, the Court finds compensable sanctions in the amount of $105,000 (the "Sanction Amount") to be distributed to unsecured creditors to be appropriate. The Sanction Amount recognizes the amount the unsecured creditors could rely upon under the Confirmed Plan and § 1227 and remedies the lack of notice and disregard of the Court oversight which is fundamental to the bankruptcy process.

The Court declines, however, to allocate the Sanction Amount among VACC, VACC's counsel, the Trustee and Debtor's counsel as proposed. Rather, the Court finds VACC, VACC's counsel, the Trustee and Debtor's counsel jointly and severally liable for the Sanction Amount. To the extent that VACC, VACC's counsel, the Trustee and Debtor's counsel wish to allocate amongst themselves, they may do so.[80]

---

[78] Doc. # 139 at p. 9.
[79] *Id.* at p. 14.
[80] Under the revised proposal submitted to the Court, Debtor's counsel's sanction contribution is in the form of pro bono legal services for the remainder of this Chapter 12 case. The Court expressly declines to order such an

With respect to the equity accounts and the dispute about the extent of the VACC's claimed lien interest and turnover to Debtor, the Court declines to endorse that remedy without sufficient notice to all creditors under Federal Rule of Bankruptcy Procedure 9019 (incorporating Rule 2002). While various values of the equity accounts have been put on the record in this case, all creditors are entitled to evaluate for themselves whether those amounts, recognized as belonging to Debtor, should be included in a distribution to creditors under a modified plan. Accordingly, such a proposal shall be presented to the entire creditor body in accordance with Federal Rule of Bankruptcy Procedure 9019.

### 5. Additional Sanctions as to Overpayment of the Auctioneer

Although VACC recognizes the compensation paid to the Auctioneer exceeded the allowable payment pursuant to Vt. LBR 6005-1(e)(2), VACC claims that because such excess amounts would have accrued to VACC's benefit, VACC waives any claim to such amounts.[81] VACC's position misapprehends the impact of an overpayment of allowable commissions. While VACC may waive any claim it may have to the overpayment of $6,300.10, Debtor or the estate has not. If the Court were to accept VACC's position, Debtor would effectively be sanctioned in the amount of $6,300.10 for the misconduct of its counsel, VACC, VACC's counsel and the Trustee. This is inconsistent with the urging of the parties that Debtor and its principals be excused from sanctions based upon their good faith reliance on the insolvency professionals. While the Court could order the disgorgement of the entire amount paid to the Auctioneer, the Trustee, Debtor's counsel, VACC, and VACC's counsel urge the Court not to disgorge based upon the same reasoning: they each presented themselves to the Auctioneer to have apparent authority for the Unauthorized Sales.

---

arrangement and to plan contingencies to protect Debtor if counsel is unable to provide such services in the future.
[81] *See* doc. # 139 at p. 12.

Accordingly, VACC shall reduce its deficiency claim by an additional $6,300.10 as it should have been applied as part of the net proceeds of the Unauthorized Sales.[82]

### 6. Violation of the Automatic Stay

The Court specifically ordered evidence on whether VACC's violation of the automatic stay was knowing or willful (doc. # 134) such that Debtor or its principals may be entitled to damages. Historically, any deliberate act taken in violation of the stay, which the violator knows to be in existence, constituted a "willful" violation. *See In re Crysen/Montenary Energy Co.*, 902 F.2d 1098, 1105 (2nd Cir. 1990); *In re Campbell*, 398 B.R. 798, 811 (Bankr. D. Vt. 2008). While it is not clear whether the *Taggart* analysis applies to a willful violation of the automatic stay, the Court determines that under either standard that VACC's violation of the automatic stay was willful and thus, contemptuous. *See King,* 65 F.3d at 1058.

First, VACC was aware the automatic stay was in existence given its involvement in this case from its inception. Second, VACC took deliberate steps to effectuate the liquidation of its collateral.

Under *Taggart,* VACC's actions conflicted with a clear and unambiguous court order, specifically, the imposition of the automatic stay as a result of Debtor's bankruptcy filing. VACC does not dispute that it had notice of the automatic stay and that it applied to the specific types of actions taken by VACC in this case, namely, exercising control over property of the estate, enforcing its liens against property of the estate, and collecting on its claim against Debtor that arose before commencement of the case.[83] Second, the Court finds that VACC's noncompliance

---

[82] The Court recognizes that the $6,300.10 will not substantially impact the deficiency on the amounts owed to VACC. However, to ignore the overpayment would perpetuate a "no harm, no foul" posture.

[83] VACC's argument that it was not acting *against* the Debtor precludes a finding that it violated the automatic stay is not objectively reasonable and thus, does not insulate VACC from a finding of contempt. *Taggart*, 139 S.Ct. at 1802 (*citing McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("The absence of wilfullness [sic] does not relieve from civil contempt.")).

with the automatic stay is clear and convincing. VACC took multiple affirmative steps to control the liquidation of its collateral for its benefit without seeking relief from stay, as detailed above. Third, the Court finds that VACC did not diligently attempt to comply with the automatic stay in a reasonable manner. In this case, VACC never came to this Court to request relief, despite a familiarity with the process. As noted during the evidentiary hearing, VACC has been involved in multiple cases in this Court since 2000, and has requested relief from stay under similar circumstances.[84]

### 7. Debtor's Principals' Damages

On October 27th and 30th, the Court considered evidence on how the Vorstevelds had been damaged by VACC's willful violation of the automatic stay. On November 8, 2023, Paul Levine, counsel for Debtor's principals, submitted an affidavit in support of attorneys' fees incurred in connection with the Order to Show Cause,[85] to which VACC objected.[86] On December 18, 2023, VACC's counsel filed a Notice of Settlement and requested the Court refrain from issuing a decision to allow VACC and Debtor's principals to reduce their agreement to writing.[87] On January 4, 2024, VACC and Debtor's principals submitted their agreement relating to the claimed damages and requested the Court abstain from issuing a ruling on that issue.[88] The Court grants the abstention request and adopts the settlement between VACC and Debtor's principals.

### CONCLUSION

For the reasons set forth above, the Court FINDS as follows: (1) the facts establish a course of conduct by Debtor, Debtor's counsel, VACC, VACC's counsel, and the Trustee which violated this Court's orders, multiple provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy

---

[84] Testimony of Peter Fitzgerald, October 27, 2023 (doc. # 149 at 3:33-4:09; 5:06-9:27).
[85] Doc. # 153.
[86] Doc. # 155.
[87] Doc. # 161.
[88] Doc. # 167.

Procedure and the corresponding local rules of this Court; (2) VACC repeatedly willfully violated the automatic stay; (3) Debtor, Debtor's counsel, VACC, VACC's counsel, and the Chapter 12 Trustee are in contempt of Court for the multiple violations of this Court's orders, provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and corresponding rules of this Court; (4) mitigating factors preclude sanctions against Debtor; (5) sanctions against Debtor's counsel, VACC, VACC's counsel, and Chapter 12 Trustee are appropriate; (6) the Court finds the revised sanctions proposal reasonable and approves the amount of sanctions proposed, rejects the apportionment, and directs VACC, Debtor, and the Chapter 12 Trustee to notice any settlement relating to accounts under Fed. R. Bankr. P. 9019; and (7) abstaining from a determination of damages is warranted in light of the settlement between VACC and Debtor's principals.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law. A separate order will issue.

January 12, 2024                                       Heather Z. Cooper
Burlington, Vermont                                   United States Bankruptcy Judge